L. Barron Hill, J.
Plaintiff and defendant, Dorothy Wills Buttke (hereinafter called the “ wife ”), were married in 1944. During their marriage they acquired as tenants by the entirety a home in Brightwaters, a lot on Fire Island on which a shell was constructed which was finished inside by the plaintiff himself and a vacant parcel of land in Amagansett. All the property was purchased and improved with funds originating from the plaintiff’s earnings as an engineer. According to the testimony of defendant wife she began to discuss the possibility of a divorce with plaintiff as early as 1965. In September, 1986 their only daughter went away to colleg'e and in January of 1967 the wife began the discussions of divorce which gave rise to this action. According to testimony of both the defendant wife and of the plaintiff the husband never wanted the divorce but in fact wanted the wife to stay. Nevertheless, in March or April of 1967 he finally said he would give her a divorce. According to the wife plaintiff handed her a memorandum stating that he would let her keep a savings account in the Bay Shore Federal Savings and Loan of about $4,000 which was already in her name but which apparently represented proceeds of an insurance policy for which plaintiff had paid the premiums and mortgage proceeds on the summer house on Fire Island. He also offered to give her $2,000 cash, pay her $25 a week for a year, give her certain stock (John’s Bargain Stores) then worth about $500 and transfer to her a 1961 Buick. According to the wife “ He really didn’t want to make the offer but he did make it ”. How this came about is not explained as she testified as to this “ offer” that “ I didn’t discuss those (items) with him at all. That’s what he offered me ”. In spite of her contention that no discussions took place 11 after a while ” plaintiff also agreed to give her the Amagansett property. According to the wife’s testimony, however, she continued to remain silent, even after the Amagansett property was thrown in, and *169 she never said anything at all nor in any way agreed with her husband about the division of the property. He testified that she agreed that she would have her attorney transfer her interest in the home and the Fire Island summer house to him. After this however, according to the plaintiff she ‘ ‘ came home one night very disturbed, she said that a friend of hers, an acquaintance, had just been hired as (her lawyer’s) secretary; she was afraid that her private, our private deals would be gossiped all over town. She further said she was undecided whether she wanted to leave or not. She said it would be a waste of time for us to go through all this paperwork and then decide to stay. She said, based on this, she would prefer to omit these settlements from the divorce decree, from the power of attorney papers. She promised, and gave me her word of honor, that if she decided to leave, she would consummate this agreement ’ ’.
A couple of weeks after this, apparently early in May of 1967, defendant wife had an attorney from her lawyer’s office come to the house one evening with the power of attorney which she wanted her husband to sign. He had no attorney of his own, but he admits that he signed the power of attorney and that he regarded the attorney as performing no more than the function of a notary. She then told plaintiff that she was going up-State with her sister but apparently she went to Mexico and secured a divorce dated May 9,1967. She was accompanied on the trip by an old acquaintance of plaintiff, defendant Louis Buttke, who at the same time, with the assistance of the same hometown lawyer, obtained a. Mexican divorce from his wife. For reasons not very clear the wife did tell plaintiff about May 16th that she was going to Mexico for the divorce and she left for a few days. The wife continued, however, to live with the plaintiff until September 16th, when she finally moved out. She married Buttke in October of 1967. According to the wife, even after she had the divorce the plaintiff did not want her to move out. When she finally did leave ‘11 left everything ’ ’ including a joint checking and joint savings account and most of the furniture and furnishings. Even as to the things she took, she admits telling the plaintiff that he could have back anything he wished. She did not, however, do anything about transferring title to the real property and at this point plaintiff finally consulted an attorney. Negotiations to settle the property questions came to naught and plaintiff, who has never transferred to the wife the items he agreed to transfer now offers to complete his performance and asks that the wife be ordered to execute deeds to the home and the summer house. He also sought in this action to annul the Mexican divorce on the ground *170 of fraud, but he has now withdrawn this prayer for relief. He also asks $3,500 in legal fees which he alleges he has been obliged to expend herein and requests that defendants pay him $50,000 for fraud and conspiracy. The actions for conspiracy against all defendants were dismissed at the trial for lack of proof.
Defendant wife counterclaims and asks that all the real property be partitioned, that the plaintiff account for the rents and profits from the real property, that he pay the wife one half the value of the joint bank accounts, furniture and stock and mutual funds retained by the plaintiff, that he pay defendants Helen and Louis Buttke $7,500 in counsel fees and $50,000 exemplary and punitive damages for maliciously prosecuting this action.
As to the relief requested by the plaintiff, the defendants object that the evidence does not establish any such agreement by the wife as is claimed by plaintiff, and that assuming arguendo that such an agreement was made it may not be enforced because it violates public policy as an agreement to obtain a divorce and also the interdiction of the Statute of Frauds against oral contracts affecting title to real property.
Considering first the question whether or not there was an agreement between plaintiff and defendant, Dorothy Wills Buttke, as to the division of the property I find that there was. This finding is based not only on the testimony of the plaintiff but on the surrounding circumstances. Defendant wife would have the court believe that although she wanted a divorce and her husband did not, he voluntarily and without consideration from her, offered to give her certain assets, although 1 ‘ he really didn’t want to make the offer ” and that in the face of her continued silence he then bettered the offer by adding the Amagansett property. She offers no explanation of what prompted him to make such offers and answered “ I don’t remember ” to the question of whether he offered the property settlement when she .said she wanted a divorce. Only a very detailed and convincing explanation of such bizarre action on the part of a man who admittedly wanted to part with neither his wife nor his property could justify a finding for the wife’s version of the facts. The testimony of the defendant wife however, was at best guarded and elliptical and in the opinion of the court far from frank. By her own account she is a woman of significant silences which speak volumes to those who are willing to hear. Her testimony, such as it was, and her version of the facts are rejected as incredible.
The contention that the agreement was contrary to public policy is unpersuasive. Defendants cite Matter of Rhinelander *171 (290 N. Y. 31) in support of their argument, but that case makes clear that what must be eschewed are agreements (p. 37) “ shown to be part of a scheme to obtain or facilitate a divorce, as when a husband promises to pay alimony as a reward to his wife for getting a divorce, or when the money provisions for her support are a premium or award, inducement or advantage to the wife for procuring a divorce Here the agreement appears to have been wrung from a reluctant husband who was making a desperate effort to placate a discontented wife with evidence of an affection sufficient to give her whatever she wanted including a divorce and a share of his property. As defendant wife admits that she never told her husband that she wanted a divorce to marry his old acquaintance Buttke, the husband’s attempts to pacify and humor her, especially in the light of her apparent indecision as to whether she would ever leave at all, may have seemed the last best hope of keeping the marriage together.
The argument that the agreement runs afoul of the Statute of Frauds is likewise without merit in this case. Subdivision 4 of section 5-703 of the General Obligations Law states “ Nothing contained in this section abridges the powers of courts of equity to compel the specific performance of agreements in cases of part performance ”. In this case the execution of the power of attorney was the performance of what to the wife at the time was the most important part of the understanding. Moreover, the Statute of Frauds cannot be used as a shield for fraud (Hummell v. Cruikshank, 280 App. Div. 47 and cases cited therein). In view of the very high degree of good faith that is required of transactions between husband and wife (see Prime v. Hinton, 244 App. Div. 181; Kantrowitz v. Kantrowitz, 21 A D 2d 654) it is clear that the plaintiff here was misled and deceived into conferring jurisdiction on the Mexican court. As putting the parties back into status quo ante would be a poor service to all which is no longer requested by plaintiff it is not too much for equity to require that the wife do what she originally undertook to do. The defendant wife shall execute and deliver to plaintiff a proper deed sufficient to transfer to the plaintiff her interest as tenant by the entirety in the former home and summer home of the parties. The title to the New York real property was not affected by the fraudulently procured foreign divorce. (See Huber v. Huber, 26 Misc 2d 539 and cases cited therein for a discussion of the impact on real property titles of a foreign divorce.) Simultaneously the plaintiff must convey to the wife his interest in the Amagansett property, pay to her $500 as the value of the John’s Bargain Store stock at the time of the divorce, pay to her the wholesale value at that time of the *172 1961 Buick automobile and pay to her $3,300 in accordance with the agreement to pay her $2,000 and $25 a week for one year. As to all other property left by the wife, including the furnishings, furniture, bank books and other personalty the court finds that to the extent that the wife had any interest in them she intended to relinquish it and did relinquish it to the plaintiff. The plaintiff’s action for counsel fees is dismissed as are all the actions of the defendants against the plaintiff.